Stephen C. McKenna
mckennas@sec.gov
Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, CO 80202
Telephone: (303) 844-1000
Facsimile: (303) 844-1068

Local Counsel
David J. Van Havermaat, Cal. Bar No. 175761
vanhavermaatd@sec.gov
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, CA 90036
Telephone: (323) 965-3840
Facsimile: (323) 965-3908

Attorneys for Plaintiff Securities and Exchange Commission

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>NANCY SHAO WEN CHU, ELIZABETH TSANG, AKA YUEN YEE TSANG, AND ERIC JON STRASSER,<br><br>Defendants. | CV11-09859 P (FMOx)<br><br>CASE NUMBER_____<br><br><br>**COMPLAINT** |

1

Plaintiff, Securities and Exchange Commission ("SEC" or "Commission"), alleges:

## I.   SUMMARY OF THE CASE

1.     This matter involves a securities fraud scheme at Soyo Group, Inc. ("Soyo"), a now defunct California-based consumer electronics and computer parts company. Between January 2007 and November 2008 (the "Relevant Period"), Soyo, through the actions of its chief financial officer ("CFO") and *de facto* chief executive, Nancy Shao Wen Chu ("Chu"), and members of her accounting staff, Elizabeth Tsang, aka Yuen Yee Tsang, ("Tsang") and Eric Jon Strasser ("Strasser"), misled investors, Soyo's primary lending bank, and its auditor by materially overstating Soyo's net revenues and understating its liabilities. Soyo's false financial statements were included in periodic filings made with the Commission, filings that Chu certified and signed as Soyo's CFO, and ultimately controlled. The scheme made Soyo appear financially successful when in fact it was not, artificially inflated Soyo's stock price, and allowed Soyo to obtain working capital from its lender.

2.     As part of the scheme, Chu and Tsang caused Soyo to book over $47 million in fraudulent sales revenues arising from at least 120 fictitious transactions with 21 customers. These fictitious sales resulted in Soyo materially overstating its net revenues in its periodic filings during the Relevant Period by amounts ranging from 14.4 to 76.8 percent.

3.     Chu and Tsang's scheme operated in part to artificially inflate Soyo's stock price. And Soyo intended to list its shares on the American Stock Exchange ("AMEX") as soon as it met the minimum share price to do so.

4.     In furtherance of the scheme, Soyo, Chu, and Tsang used phony receivables, booked as a result of fictitious sales, to acquire working capital from a

revolving line of credit at United Commercial Bank ("UCB"), Soyo's primary lending bank.

5.     As part of the scheme, Tsang, with knowledge and approval from Chu, round-tripped funds through Asian bank accounts to pay off the receivables connected with the fake sales in order to avoid their detection by Soyo's auditor, Vasquez & Company, LLP ("Vasquez") and UCB.

6.     In furtherance of the scheme, Chu and Tsang made false statements and falsified and forged documents in an effort to substantiate the fictitious sales to Vasquez, in connection with the audits of Soyo's financial statements.

7.     As part of the scheme, in order to obtain additional bank financing for Soyo and keep its existing line of credit from defaulting, Chu also misled Soyo's investors, primary lending bank, and its auditor regarding a six million dollar debt-for-equity transaction being negotiated with a Soyo vendor, Tatung Company, Inc. ("Tatung").

8.     In its Form 10-Q for the period ended June 30, 2008, which Chu signed, Soyo announced that it had agreed to exchange 5.9 million of its shares of common stock to eliminate an outstanding Tatung accounts payable of slightly over $6 million, thereby reducing Soyo's current liabilities by 13.9% (to $37,264,536) and its accounts payable by 41.9% (to $8,327,606).

9.     At the time of the announcement, however, Chu knew that the transaction with Tatung was still being negotiated and was subject to cancellation.

10.     Strasser, a consultant who prepared Soyo's SEC filings, was alerted to the falsity of the Tatung transaction disclosures in the Form 10-Q for the period ended June 30, 2008, shortly after it was filed. But Strasser failed to correct the misstatements or inform Soyo's auditor prior to the next quarter's filing.   In fact, Strasser participated in the scheme by drafting Soyo's next quarter Form 10-Q,

which made the same false disclosures and omitted the same liabilities relating to the Tatung transaction.

11.   Contrary to the representations made in Soyo's periodic filings regarding the Tatung debt-for-equity deal, the deal was never finalized and eventually fell through.  This prompted Strasser to write Chu, in a November 9, 2008 e-mail, that "we are really screwed" because "we have already announced in our 10Q that they took the 5.9 MM shares of stock for their A/P [account payable]."

12.   Soyo's registration statement on Form S-8, filed and effective on March 7, 2005, and signed by Chu, incorporated by reference Soyo's subsequently filed fraudulent reports.

13.   As a result of the foregoing, Chu and Tsang violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].  For the same reasons, Chu also violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)].

14.   Chu, as a control person of Soyo under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], directly or indirectly, engaged in acts, practices and courses of business that constitute violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

15.   The facts alleged herein also establish that Strasser, and alternatively, Chu and Tsang, aided and abetted Soyo's violation of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

## II.   JURISDICTION AND VENUE

16.    The Court has jurisdiction pursuant to authority conferred on it by Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

17.    In connection with the transactions, acts, practices, and/or courses of business described in this Complaint, the Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, and/or of the means and instruments of transportation or communication in interstate commerce.

18.    Venue lies in this District pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and 28 U.S.C. § 1391(b)(1) & (2).  During the period of conduct alleged herein, certain of the transactions, acts, practices, and courses of business constituting the violations of law alleged herein occurred in the Central District of California.  In addition, defendant Chu resides in the Central District of California.

## III.   DEFENDANTS

19.    Nancy Shao Wen Chu, age 53, is a resident of Claremont, California. Chu served as Soyo's CFO between 2002 and 2009 and she was also effectively the chief executive officer ("CEO") as she ran the day-to-day operations of the company.  Chu was also a member of Soyo's board of directors.  Chu, together with her husband, owns over 47 percent of Soyo's outstanding shares, making them Soyo's largest shareholder.  Chu signed all of Soyo's periodic filings with the Commission during the Relevant Period and had ultimate control over the content of those filings.

20.    Elizabeth Tsang aka Yuen Yee Tsang, age 48, resided in Walnut, California, during the Relevant Period, but may now reside in Brunei Daarussalam.

1   Tsang, who is Chu's sister-in-law, was employed by Soyo between 2002 and 2009

2   and, during the Relevant Period, was the accounting manager at Soyo who handled

3   accounts receivable, and accounts payable relating to vendors outside the United

4   States.

5        21.    Eric Jon Strasser, age 48, is a resident of Las Vegas, Nevada.

6   Between approximately 2005 and 2009, Strasser was a consultant to Soyo who

7   acted as its de facto controller in that he prepared Soyo's periodic filings with the

8   Commission and was a liaison between Soyo and its auditor, Vasquez.  On

9   January 13, 2011, Strasser pled guilty to a felony count of violating 18 U.S.C. § 4,

10  Misprison of a Felony.

11                        **IV.    RELATED PARTY**

12       22.    Soyo Group, Inc. was, during the Relevant Period, a Nevada

13  corporation located in Ontario, California, primarily in the business of selling LCD

14  televisions, monitors, computer parts and peripherals.  Despite reporting over $197

15  million of purported net revenues during the Relevant Period, Soyo was unable to

16  repay its bank loans to UCB and, on May 5, 2009, Soyo filed for bankruptcy

17  protection.  Soyo has since ceased all business operations.

18                        **V.    FACTS**

19       **A.    Overview of the Fictitious Sales/Round-Tripping Scheme**

20       23.    As noted above, Chu and Tsang orchestrated the fraudulent scheme to

21  inflate Soyo's net revenues whereby Soyo booked over $47 million in false

22  revenue based on at least 120 fictitious sales transactions.  The scheme typically

23  began with Soyo personnel falsifying a purchase order for an old or sham

24  customer.  In some instances, the purchase order included products that Soyo did

25  not even sell.

26

24. Then a fake sales order would be created and, once approved by Chu, the accompanying phony receivable was booked. Soyo could then use the receivable as collateral to borrow funds on its revolving, asset-backed credit line with UCB, because the credit line was based, in part, on Soyo's accounts receivable balance.

25. The borrowed funds could then be spent for Soyo's immediate working capital needs, including payroll and entertainment expenses.

26. Because any receivables that were over 90 days delinquent could not be counted toward Soyo's credit limit, the failure to pay down the receivables associated with the fake sales would result in a reduction of Soyo's borrowing capacity.

27. Accordingly, to avoid having its loan called by UCB, Soyo would, as needed, book additional fake sales and receivables and then use, among other things, newly borrowed funds to pay off the old receivables through the round-tripping process described below. This cycle continued until Soyo reached the credit limit of its credit line and could no longer obtain additional credit from UCB.

28. The scheme had the effect of boosting Soyo's net revenues and stock price. For example, Soyo posted net revenue of $110,922,809 for 2007, up 95.4% from the $56,758,688 posted in 2006, which resulted in an increase in its share price from a low of $.28/share in the first quarter of 2007 to a high of $1.80/share in the fourth quarter of 2007. As stated in Soyo's Form 8-K dated September 10, 2007, the company planned to list on the AMEX as soon as it could meet the minimum share price required to do so.

29. To refresh the phony receivables without detection, Soyo would round-trip funds via purported vendors in Asia that were controlled by Chu

through her relatives, such as Korndale Group Ltd. ("Korndale") and Randy Company Ltd. ("Randy").

30.    Soyo would ostensibly purchase products from these "vendors" to fulfill the fake orders generated by the fraudulent sales.  Invoices for the phantom products that Soyo needed to fulfill the fake orders were fabricated for these vendors and, at the same time, Soyo personnel prepared false shipping records showing that the phantom products were delivered to Soyo's end customers.

31.    Soyo would then wire the money obtained through, among other things, its UCB credit line to pay the vendor's fake invoices.  Soyo sent instructions to the purported vendors that the funds be sent back to Soyo through Asian bank accounts associated with four entities: Iron Business Corporation; Forever Popular Development Ltd.; Faith Mind Trading Ltd.; and Jade Pacific Holding Group, Inc. (hereinafter the "Asian Funding Companies").

32.    In this manner, the scheme allowed funds to be "round-tripped" from Soyo to the Chu-controlled entities and back to Soyo, who used the funds to pay down the phony receivables and to maintain the credit limit, thereby giving Soyo access to more funds.  The Asian Funding Companies were used to hide the round-tripping of funds from Vasquez and UCB and were, like Korndale and Randy, controlled by Chu through her relatives.

33.    Communications involving Tsang and Chu reflect the fraudulent nature of these round-trip transactions.  For example, an April 17, 2007 e-mail from a Korndale employee to Chu and Tsang states:

> Do **NOT** put any staff from Soyo Taipei into Korndale's document in the future, no matter it's PO . . . or anything else.  Korndale is supposed to be one of your vendors (or sometime a customer) which has nothing to do with SOYO.  Korndale will become useless to you once CPA or SEC find out this company is actually one of a SOYO-controlling company.  Be more careful with it!!

**B.    Chu and Tsang Participated In and Concealed the Fictitious Sale/Round-Tripping Scheme**

34.    As CFO and head of the sales department, Chu was aware of the phony sales transactions.  She is listed as the salesperson in Soyo's accounting system for the majority of them.  Additionally, per Soyo's own sales policy, Chu was required to review and sign off on each of Soyo's sales orders, which she did for the bulk of the fraudulent transactions.

35.    Tsang kept a log of the fake sales to ensure that they were paid off with funds round-tripped through the Asian Funding Companies.  In fact, Soyo's bank records show that the Asian Funding Companies were used to pay over $28.7 million of the receivables associated with the fake sales in a manner consistent with Tsang's log.

36.    Moreover, an e-mail from Tsang dated December 5, 2008, forwards an e-mail chain with round-tripping instructions dating back to August 19, 2008, and shows that Tsang sent funds to Korndale and/or Randy with directions to wire the funds back to Soyo through one of the Asian Funding Companies to pay off specifically identified Soyo customer receivables.  The instructions in Tsang's e-mail chain are also consistent with the notations on her log of the fake sales and Soyo's bank records.

37.    Chu was forwarded a portion of this e-mail chain on September 11, 2008 (before the Form 10-Q for the period ended September 30, 2008 was filed) that contained several round-tripping instructions involving the Asian Funding Companies.  Chu also signed authorizations for the wires to Korndale and Randy for almost all of the transactions discussed in the e-mail chain.

38.    One example of a phony sale and fraudulent round-trip payment is as follows:

9

- On April 7, 2008, Chilisun Computer of Richardson, Texas ("Chilisun") purportedly issued a Purchase Order to Soyo for 1080 24" LCD monitors at a total cost of $313,200;

- On April 24, 2008, Soyo issued a sales order, initialed by Chu, and an invoice to Chilisun for those monitors;

- Tsang's December 5, 2008, e-mail chain references a $200,000 wire sent to Korndale, and includes instructions to wire back to Soyo "$45,000 from Iron Business's Bank ref # Chilisun."  In a November 13, 2008 e-mail in the chain that references a $290,000 wire sent to Randy, Tsang provides instructions to wire back "$268,200 from Iron Business's Bank ref# Chilisun Computer." These two wires back to Soyo via Iron Business ($268,200 and $45,000) total the $313,200 on the Chilisun sales order.

- Chu signed authorizations for the $200,000 wire to Korndale and the $290,000 wire to Randy.

- A Soyo Customer Ledger Listing for Chilisun reflects the $313,200 invoice and the payments of $268,200 and $45,000, less $15 wire fees.  That Ledger Listing, however, also reflects that Chilisun had no purchases from Soyo between March 17, 2004 and March 14, 2007, and that when Chilisun purchases purportedly resumed they were much larger than previous purchases – the largest invoice amount prior to 2007 was $18,850, and many invoices were for under $1,000; after purchases began to appear again in 2007, invoice amounts ranged from $287,040 to $540,000.

- In October of 2009, in response to an SEC subpoena, Chilisun stated in writing that "There is NO business transaction between Chilisun and Soyo Group for the time period January 1, 2007 through the

present.  We have NOT done any business with Soyo in at least five years or longer."

- Soyo's files include a Bill of Lading from MJC Freight Systems Inc. ("MJC") in Memphis, Tennessee, dated April 24, 2008, for shipment of the monitors to Chilisun; but the SEC staff has been unable to confirm the existence of a company by the name of MJC Freight Systems Inc. in Memphis, Tennessee.  The phone number listed on the MJC Bill of Lading has an Oakland, CA area code and connects to a person that is unaware of MJC.

39.    In executing their scheme, Chu and Tsang took deliberate steps to hide the scheme from Vasquez.

40.    For example, in early 2009, Tsang falsified account receivable confirmations – confirmations purportedly sent to Soyo customers to verify their account receivable balances in connection with a Vasquez audit – to conceal the phony sales transactions.  In one instance, Tsang even misdirected a customer audit confirmation to her own home.

41.    Tsang also created fake purchase orders, invoices, and shipping documents for the phony sales to provide to Vasquez.

42.    Chu instructed Soyo employees to never let Vasquez personnel in Soyo's accounting area and that the audit staff would have to request documents to be brought to them, indicating that she was aware that Soyo sales orders, which she had initialed and approved, were fictitious.

43.    Chu also signed management representation letters to Vasquez for the first two quarters and fiscal year end of 2007 and the first quarter of 2008, that falsely stated, among other things, that Soyo's sales transactions were properly recorded, that she had no knowledge of fraud that could materially affect Soyo's

financial reports, and that all receivables on the balance sheet represent valid claims against debtors for sales.

44.    Chu's knowledge of the fraudulent sales and need to conceal the scheme from Vasquez is apparent from an e-mail to Strasser.  On March 4, 2009, when Soyo was planning to book a large return to eliminate approximately $13 million of the fake receivables, Tsang was asked by Vasquez for contact information so they could get confirmation that Soyo's suppliers would accept the returns.  In response to this news, Chu sent an e-mail to Strasser saying: "I think you really need [to] help Elizabeth [Tsang] because she can not [sic] afford Auditor asking [for] all the information."

45.    Vasquez became aware of the fictitious sales and round-tripping scheme during their 2008 audit, following a February 2009 tip from a Soyo accounting manager who provided them with documents evidencing the phony transactions and told them what to look for during the audit.

46.    Following the tip and the accounting manager's subsequent resignation from Soyo, Chu sent a Soyo employee to the former accounting manager's house with instructions to tell the manager not to say too much about the manager's work at Soyo to anyone.

47.    Soyo committed fraud by engaging in a scheme to create fictitious sales transactions and thereby fraudulently reporting materially misleading sales revenues in its financial filings for fiscal years 2007 and 2008.

48.    As CFO, de facto CEO, director, and, with her husband, the largest shareholder of Soyo, Chu had ultimate authority for the statements made in Soyo's SEC filings during the relevant period.  Moreover, because Chu signed and certified the filings, the statements therein are attributable to her and therefore made by her.

12

49.     Chu exercised control over the general operations of Soyo and had the power to exercise control over the fraudulent sales transactions.  Moreover, by acting as the sales person on sales, signing sales orders, authorizing round-trip wires, and concealing the fraudulent sales from Soyo's auditor she was a culpable participant in those transactions.

50.     By creating and reporting overstated revenue through fictitious sales, by creating bogus receivables to borrow funds, and by paying down those receivables with fraudulent round-trip transactions, Chu and Tsang actively employed devices, schemes, or artifices to defraud and/or engaged in acts, practices, or courses of conduct which operated as a fraud or deceit.

51.     Chu and Tsang knew that Soyo was engaging in fraud and that its periodic filings were fraudulent.  They were also aware of their roles in the illegal activity and the substantial assistance they provided in furthering the fraud.

**C.    Chu and Strasser Were Responsible for Materially Understating Soyo's Liabilities by Improperly Reducing Liabilities by $6 Million Based Upon a Debt-for-Equity Transaction with Tatung That Was Never Completed**

52.     In its Form 10-Q for the period ended June 30, 2008, Soyo announced falsely that it had consummated a $6 million debt-for-equity transaction with one of its vendors, Tatung, a Taiwanese company that manufactured LCD televisions for Soyo.  The transaction reduced its current liabilities by 13.9% (to $37,264,536) and its accounts payable by 41.9% (to $8,327,606).

53.     Contrary to Soyo's disclosures, the debt-for-equity transaction with Tatung was never finalized and it eventually fell apart.

54.     The debt-for-equity idea arose because, by late 2007, Soyo owed Tatung approximately $7 million for products ordered and shipped.  As a result of

the large overdue receivable, Tatung refused to ship additional products to Soyo and threatened to sue.

55.     In April 2008, the parties discussed resolving Soyo's delinquency by swapping the balance owed to Tatung for Soyo stock, a large amount of which Soyo would agree to repurchase over time.

56.     At the time of the Tatung negotiations, Soyo wanted to complete the transaction to improve its balance sheet and its borrowing position.  For one thing, the Tatung transaction was needed to bring Soyo back into compliance with its debt covenants and avoid default on its multi-million dollar credit line with UCB.

57.     Soyo's establishment of a new or expanded credit line was also important to Tatung because it would strengthen Soyo's financial condition and provide a source of funds to repurchase the stock issued to Tatung for the Soyo debt.

58.     To avoid the chicken and egg problem of having potential lenders that would want a final settlement with Tatung at the same time as Tatung wanted Soyo to have a new credit line before settling, Chu proposed having Tatung execute a settlement agreement and, concurrently, execute an addendum that rendered the transaction non-binding for a four-week period to allow Soyo to complete a new bank financing.

59.     According to the addendum, which Chu signed, during the non-binding period Tatung had complete discretion to cancel the settlement agreement.

60.     On June 11, 2008, Chu sent Tatung's legal counsel an e-mail requesting an extension of the non-binding period to the end of July 2008 so, in Chu's words, Soyo could "finalize our loan commitment, which needs to be completed before we can finalize our settlement with Tatung."

61.     Due to Soyo's difficulties in obtaining bank financing, on August 5, 2008, Chu was informed by Tatung that the non-binding period would be extended

again to the end of September 2008.  However, at that time, Chu was also told that "[i]f SOYO could not get [the] ABL line approved, all the agreements related to payment solution [are] void.  Tatung will re-negotiate with SOYO on another solutio[n] or go through legal lawsuit action."

62.     Notwithstanding her knowledge that the Tatung agreement was non-binding and subject to cancellation, nine days later Chu signed and caused to be filed Soyo's Form 10-Q for the period ended June 30, 2008, disclosing the Tatung transaction as a done deal and removing the multi-million dollar Tatung liability from Soyo's balance sheet.  Specifically, the Form 10-Q falsely stated that "[t]o settle the debt, the Company issued 5,900,000 shares of its restricted common stock to the supplier in return for the retirement of $6,004,028 of debt."

63.     A week after the second quarter Form 10-Q was filed, Strasser was copied on an August 21, 2008 e-mail showing that Tatung was still negotiating with Soyo regarding the debt-for-equity deal.  That same day, Strasser e-mailed Chu: "This is a major, major problem.  I need to understand what's going on here as it contradicts what is in the 10-Q."

64.     Nonetheless, Strasser did not alert Soyo's auditor even though he had just told them during their second quarter fieldwork that the Tatung deal was final. Nor did he alert them when he was copied on an e-mail forwarding the purported final agreement with Tatung to Vasquez on September 23, 2008.

65.     Instead, Strasser drafted Soyo's Form-10-Q for the next quarter, that made the same false disclosures and omitted the same liabilities relating to the Tatung transaction as it did in the previous quarter's Form 10-Q.

66.     On September 30, 2008, Tatung notified Chu by e-mail that the debt-for-equity transaction was cancelled.

67.   Chu acknowledged the bleak situation with Tatung in an e-mail dated October 14, 2008, in which she wrote that "[t]o change the deal [with Tatung] now, we would have to amend our SEC filings, which is very bad.  The SEC and our shareholders would start asking questions, and we would be required to amend our filing and inform our bankers, which would kill any chance of an ABL line."

68.   Strasser summed up the situation in a blunt e-mail to Chu on November 9, 2008, as follows:

> [W]e are really screwed in a lot of ways.  We are not going to be able to pay Tatung under any circumstances, and we have already announced in our 10Q that they took the 5.9 MM shares of stock for the A/P.  We are surely going to get sued and have to spend a fortune on lawyers.  This situation is horrible . . . .

69.   On the very next day, November 10, 2008, Chu signed another Form 10-Q for the period ended September 30, 2008, that again falsely reported that the Tatung transaction was completed.

70.   Soyo committed fraud by reporting that the Tatung debt-to equity transaction was complete and concealing the fact that it had signed a side agreement allowing Tatung to cancel the transaction at any time, thereby violating the federal securities laws.

71.   As CFO, de facto CEO, director, and, with her husband, the largest shareholder of Soyo, Chu had ultimate authority for the statements made in Soyo's Form 10-Qs for the second and third quarter of 2008.  Moreover, because Chu signed and certified the filings the statements therein are attributable to and therefore made by her.

72.   Chu exercised control over the general operations of Soyo and had the power to exercise control over the fraudulent accounting of the Tatung debt-for-equity transaction.  Moreover, by signing Soyo's false SEC filings, executing the addendum to the agreement, and concealing the true, unfinished and contingent

nature of the proposed transaction with Tatung from Soyo's auditor, she was a culpable participant in the fraud.

73.   By materially understating Soyo's current liabilities and accounts payable by misrepresenting the Tatung debt-for-equity transaction, Soyo and Chu actively employed a scheme, device, or artifice to defraud and/or engaged in an act, practice, or course of business which operated as a fraud or deceit.

74.   Chu knew that the statements regarding the Tatung transaction in Soyo's Form 10-Q for the second quarter of 2008 were false at the time those statements were made because she knew that the debt-for-equity transaction with Tatung was not final and was subject to cancellation. She therefore knew that the 10-Q understated Soyo's current liabilities and accounts payable by $6 million.

75.   Chu and Strasser both knew that the statements regarding the Tatung transaction in Soyo's Form 10-Q for the third quarter of 2008 were false at the time those statements were made because they knew that the debt-for-equity transaction with Tatung was not final and was subject to cancellation. They both therefore knew that the 10-Q understated Soyo's current liabilities and accounts payable by $6 million.

76.   Chu and Strasser knowingly provided substantial assistance to Soyo in misstating the status of the Tatung debt-for-equity transaction and Soyo's financial liabilities. Despite this knowledge, Chu and Strasser failed to bring the Tatung issue to the attention of Soyo's auditor.

## FIRST CLAIM FOR RELIEF
### FRAUD:  Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against Chu and Tsang)

77.   The Commission realleges and incorporates by reference paragraphs 1 through 76.

78.    Chu and Tsang, acting with scienter, by use of means or instrumentalities of interstate commerce or of the mails, or of any facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person.

79.    By engaging in the conduct described above, Chu and Tsang have violated and unless restrained and enjoined will in the future violate Section 10(b) of the Securities Act and Rule 10b-5 thereunder [15 U.S.C. §§ 78j(b) and 17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### SECURITIES FRAUD:  Control Person Liability under
### Section 20(a) of the Exchange Act for Soyo's Violations of Section 10(b)
### of the Exchange Act and Rule 10b-5
### (Against Chu)

80.    The Commission realleges and incorporates by reference paragraphs 1 through 76.

81.    Soyo, directly and indirectly, acting with scienter, by use of means or instrumentalities of interstate commerce or of the mails, or of any facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated

or would operate as a fraud or deceit upon any person, in violation Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

82.   As CFO, *de facto* CEO, director, and the largest shareholder of Soyo, Chu exercised control over the general operations of Soyo and had the power to exercise control over the specific activity upon which Soyo's violations are based. Moreover, Chu was a culpable participant in Soyo's illegal conduct.

83.   Chu therefore has control person liability pursuant to Section 20(a) of the Exchange Act [15 U.S.C. §78t(a)] for Soyo's violations of Section 10(b) and Rule 10b-5.

### THIRD CLAIM FOR RELIEF
### SECURITIES FRAUD:  Aiding and Abetting Soyo's Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Chu and Tsang (in the alternative), and Strasser)

84.   The Commission realleges and incorporates by reference paragraphs 1 through 76.

85.   Soyo, directly and indirectly, acting with scienter, by use of means or instrumentalities of interstate commerce or of the mails, or of any facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person, in violation Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

86.     By engaging in the conduct described above, Chu, Tsang, and Strasser knowingly provided substantial assistance to Soyo's violation(s) of Sections 10(b) of the Exchange Act and Rule 10b-5, and therefore are liable as aiders and abettors pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

87.     Unless restrained and enjoined, Chu, Tsang, and Strasser will continue to aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**FOURTH CLAIM FOR RELIEF**
**SECURITIES FRAUD:  Violations of Section 17(a) of the Securities Act**
**(Against Chu)**

88.     The Commission realleges and incorporates by reference paragraphs 1 through 76.

89.     Chu, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails: (a) with scienter, employed a device, scheme, or artifice to defraud; (b) obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in a transaction, practice, or course of business that operated or would operate as a fraud upon purchasers of securities.

90.     By engaging in the conduct described above, Chu has violated and unless restrained and enjoined will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### A.
### [Declaratory Judgment]

Find that each defendant committed the violations alleged.

### B.
### [Injunctive Relief]

Enter an Order of Permanent Injunction as to each defendant, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, enjoining each of them from further violations of the provisions of law and rules alleged against them in this Complaint.

### C.
### [Disgorgement of Ill-Gotten Gains]

Enter an Order directing each defendant to disgorge and pay over, as the Court may direct, any and all ill-gotten gains received or benefits in any form derived from the illegal conduct alleged in this Complaint, together with pre-judgment interest thereon.

### D.
### [Civil Penalties]

Enter an Order requiring each defendant to pay third-tier civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S. C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S. C. § 78u(d)(3)].

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## E.
## [Other Relief]

Grant such further equitable relief as this Court deems appropriate and necessary.

DATED: November 29, 2011

Respectfully submitted,

David J. Van Havermaat, Cal. Bar No. 175761
Local Counsel
vanhavermaatd@sec.gov
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, CA 90036
Telephone: (323) 965-3840
Facsimile: (323) 965-3908

Stephen C. McKenna
mckennas@sec.gov
Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, CO  80202
Phone: (303) 844-1000
Fax:  (303) 844-1068

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Manuel Real and the assigned discovery Magistrate Judge is Fernando M. Olguin.

The case number on all documents filed with the Court should read as follows:

## CV11- 9859 R (FMOx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

Unless otherwise ordered, the United States District Judge assigned to this case will hear and determine all discovery related motions.

===============================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
Stephen McKenna
1801 California St., Ste 1500, Denver, CO 80202
David J. Van Havermaat
5670 Wilshire Blvd, 11th Floor
Los Angeles, CA, 90036

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| SECURITIES AND EXCHANGE COMMISSION | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | **CV11-09859** R (FMOX) |
| v. | |
| NANCY SHAO WEN CHU, ELIZABETH TSANG AKA YUEN YEE TSANG AND ERIC JON STRASSER | **SUMMONS** |
| DEFENDANT(S). | |

TO:    DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Stephen C. McKenna_____, whose address is _1801 California Street, Suite 1500 Denver, CO 80202_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:    _____NOV 2 9 2011_____

By: _____
                     Deputy Clerk
                 (Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

Name & Address:
Stephen McKenna
1801 California St., Ste 1500, Denver, CO 80202
David J. Van Havermaat
5670 Wilshire Blvd, 11th Floor
Los Angeles, CA, 90036

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| SECURITIES AND EXCHANGE COMMISSION | CASE NUMBER |
|---|---|
| **PLAINTIFF(S)** | CV11-09859 R(FMOX) |
| v. | |
| NANCY SHAO WEN CHU, ELIZABETH TSANG AKA YUEN YEE TSANG AND ERIC JON STRASSER | **SUMMONS** |
| **DEFENDANT(S).** | |

TO:   DEFENDANT(S): _____

_____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Stephen C. McKenna_____, whose address is _1801 California  Street, Suite 1500 Denver, CO 80202_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:   **NOV 2 9 2011**

By: _____
     **JULIE PRADO**
          Deputy Clerk

          *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | NANCY SHAO WEN CHU<br>ELIZABETH TSANG AKA YUEN YEE TSANG<br>ERIC JON STRASSER |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Stephen McKenna, SEC, 1801 California St., Ste 1500, Denver, CO 80202; Ph. (303)844-1000. David J.Van Havermaat, SEC 5670 Wilshire Blvd, 11th Floor, Los Angeles, CA, 90036, (323) 965-3866 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1 U.S. Government Plaintiff  
☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  
☐ 2 Removed from State Court  
☐ 3 Remanded from Appellate Court  
☐ 4 Reinstated or Reopened  
☐ 5 Transferred from another district (specify):  
☐ 6 Multi-District Litigation  
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☐ MONEY DEMANDED IN COMPLAINT: $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. §§ 78j(b), 15 U.S.C. §78t(a), 15 U.S.C. § 78t(e), 15 U.S.C. § 77q(a), securities fraud

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/ PENALTY | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 830 Patent |
| ☒ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/Acco-mmodations | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | | | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | IMMIGRATION | | ☐ 690 Other | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 463 Habeas Corpus-Alien Detainee | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | | |
| | ☐ 290 All Other Real Property | | | | |

**CV11-09859**

**FOR OFFICE USE ONLY:** Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                              ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                              ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                              ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
   ☑   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  |  |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
   ☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Nancy Shao Wen Chu - Los Angeles County<br>Elizabeth Tsang - Los Angeles County | Eric Jon Strasser - Clark County (Las Vegas) |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
   **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| San Bernardino |  |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date **November 29, 2011**

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |